UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| JOHNOTHON L. MORRISON,<br><br>            Plaintiff,<br><br>      v.<br><br>JAY CHRISTENSEN; CAPTAIN<br>MARTINEZ; and SERGEANT<br>MILLER,<br><br>            Defendants. | Case No. 1:20-cv-00566-CWD<br><br>**MEMORANDUM DECISION<br>AND ORDER** |

Plaintiff Johnothon Lance Morrison is a prisoner in the custody of the Idaho

Department of Correction ("IDOC"). He is proceeding pro se and in forma pauperis in

this civil rights matter.

Plaintiff claims that prison staff failed to protect him from assault at the Idaho

State Correctional Center ("ISCC") after he was transported to that facility from the Ada

County Jail. Plaintiff alleges that Defendants Captain Martinez and Sergeant Miller knew

of Plaintiff's need for protective custody and that Plaintiff faced a substantial threat of

attack from other inmates, but that they did not separate him from the general population

immediately upon his arrival at ISCC. Plaintiff alleges that he suffered physical injuries

to his eye and nose, as well as emotional damage.

Plaintiff has been allowed to proceed on Eighth Amendment claims under 42

U.S.C. § 1983, as well as negligence claims under Idaho state law. All other claims

against all other Defendants have been dismissed. *See Successive Review Order*, Dkt. 10, at 6.

Defendants have filed a Motion for Summary Judgment. Defendants first argue that Plaintiff failed to exhaust his administrative remedies against either Defendant. They also assert that Plaintiff cannot demonstrate deliberate indifference and that his claims thus fail on the merits as a matter of law. Finally, Defendants contend that, even if Plaintiff could show a constitutional violation, they are entitled to qualified immunity. *See generally Defendants' Memorandum in Support of Motion for Summary Judgment* ("Defs' Memo. in Supp."), Dkt. 20-1.

The parties have filed responsive briefing and the motion is ripe for the Court's consideration. Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. *See* D. Idaho Loc. Civ. R. 7.1(d). Accordingly, and for the reasons that follow, the Court will grant Defendants' Motion for Summary Judgment.

## SUMMARY JUDGMENT STANDARD OF LAW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment rule "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and

prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

In resolving a summary judgment motion, the Court must consider the facts in the light most favorable to the non-moving party, unless the non-moving party's version of the facts is "blatantly contradicted by the record[] so that no reasonable jury could believe it." *Scott v. Harris*, 550 U.S. 372, 380 (2007). If such a blatant contradiction exists, then there is no "genuine" dispute as to that fact. *Id*.

The moving party bears the initial burden to show that each material fact cannot be disputed. Material facts are those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

To show that the material facts are not in dispute, the moving party may cite to specific materials in the record or show that the adverse party is unable to produce admissible evidence to support a fact or facts. Fed. R. Civ. P. 56(c)(1)(A) & (B). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment ...." *Anderson*, 477 U.S. at 247–48. Rather, a case will survive summary judgment only if there is a *genuine* dispute as to a *material* fact.

If the moving party meets this initial responsibility, the burden then shifts to the non-moving party to establish that a genuine dispute of material fact does indeed exist.

*Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 547, 586 (1986). The

existence of a scintilla of evidence in support of the non-moving party's position is

insufficient. Rather, "there must be evidence on which [a] jury could reasonably find for

the non-moving party." *Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1146 (9th

Cir.2005) (*citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court

is "not required to comb through the record to find some reason to deny a motion for

summary judgment." *Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029

(9th Cir. 2001). Instead, the "party opposing summary judgment must direct [the Court's]

attention to specific, triable facts." *So. Ca. Gas Co. v. City of Santa Ana*, 336 F.3d 885,

889 (9th Cir. 2003).

 That is, "if a defendant moving for summary judgment has produced enough

evidence to require the plaintiff to go beyond his or her pleadings, the plaintiff must

counter by producing evidence of his or her own." *Butler v. San Diego Dist. Attorney's

Office*, 370 F.3d 956, 963 (9th Cir. 2004). If the plaintiff fails to produce evidence, or if

the evidence produced is insufficient, the Court "is not required (or even allowed) to

assume the truth of the challenged allegations in the complaint." *Id*.

 If a party "fails to properly support an assertion of fact or fails to properly address

another party's assertion of fact," the Court may consider that fact to be undisputed. Fed.

R. Civ. P. 56(e)(2). The Court must grant summary judgment for the moving party "if the

motion and supporting materials—including the facts considered undisputed—show that

the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Where, as here, the party moving

for summary judgment would not bear the burden of proof at trial, that party may prevail

simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325.

The Court does not determine the credibility of affiants or weigh the evidence set forth by the parties. Although all reasonable inferences which can be drawn from the evidence must be drawn in the light most favorable to the non-moving party, *T.W. Elec. Serv., Inc.*, 809 F.2d at 630–31, the Court is not required to adopt unreasonable inferences from circumstantial evidence, *McLaughlin v. Liu*, 849 F.2d 1205, 1208 (9th Cir. 1988).

In cases involving pro se inmates, courts liberally construe the pleadings and briefs and "should avoid applying summary judgment rules strictly." *Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010). However, although pro se inmates are exempted "from *strict* compliance with the summary judgment rules," they are not exempted "from *all* compliance." *Soto v. Sweetman*, 882 F.3d 865, 872 (9th Cir. 2018). In opposing a motion for summary judgment, a pro se inmate must submit at least "some competent evidence," such as a "declaration, affidavit, [or] authenticated document," to support his allegations or to dispute the moving party's evidence. *Id*. at 873 (upholding grant of summary judgment against a pro se inmate where the "only statements supporting [plaintiff's] argument are in his unsworn district court responses to the defendant's motion for summary judgment and to the district court's show cause order").

## FACTUAL BACKGROUND

This section includes facts that are undisputed and material to the resolution of the issues raised by Defendants' motion for summary judgment. Where material facts are in

dispute, the Court has included Plaintiff's version of the facts, insofar as that version is not blatantly contradicted by clear documentary evidence. *See Scott*, 550 U.S. at 372.

### 1.    The Attack on Plaintiff

In 2018, prior to the events giving rise to Plaintiff's claims, Plaintiff was incarcerated at ISCC. He was placed in protective custody based on threats of violence directed at him by prison gangs. *Plaintiff's Am. Compl.* ("Am. Compl."), Dkt. 9 at 2.[1]

In October of 2019, Plaintiff was released on parole. *Id.* Between the time of Plaintiff's placement in protective custody in 2018 and his release from prison in 2019, Plaintiff stayed in protective custody and was not housed in the general population. *Id.*

Plaintiff later violated his parole and was held at the Ada County Jail on that violation. *Decl. of Jay Christensen* ("Christenen Decl."), Dkt. 20-3, ¶ 2. Ada County jail officials placed Plaintiff in protective custody while he was held at the Ada County Jail. *Am. Compl.*, Dkt. 9, at 3.

On August 27, 2020, Plaintiff and thirty-eight other inmates at the Ada County Jail tested positive for COVID-19. *Christensen Decl., Ex. 1*. That same day, they were transported to IDOC custody for placement in a COVID-19 isolation unit. This isolation unit had only just been established at ISCC to house COVID-positive inmates coming into IDOC custody from county custody.

---

[1] Plaintiff's Amended Complaint is signed and sworn under penalty of perjury. Therefore, the Court treats the Amended Complaint as an opposing affidavit for summary judgment purposes. Fed. R. Civ. P. 56(e); *see also McElyea v. Babbit*, 833 F.2d 196, 197–98 (9th Cir. 1987) ("McElyea's complaint has been verified; because it is based on personal knowledge and sets forth specific facts admissible in evidence, it may be considered in opposition to summary judgment.").

Under normal, pre-pandemic conditions, inmates coming into IDOC custody were taken initially to the Reception and Diagnostic Unit ("RDU") of the Idaho State Correctional Institution ("ISCI")—*not* to ISCC. *Christenen Decl*., ¶ 3. Before the pandemic, transferring inmates into the RDU at ISCI entailed coordination between the outgoing jail and the incoming prison. The outgoing jail would provide information to the incoming prison, such as information "regarding the inmates' housing details, conflicts, red flags, or other pertinent details." *Id*. at ¶ 6. Once inmates went through the intake process in the RDU at ISCI, they would be housed in whichever IDOC facility was determined most suitable given the inmates' housing requirements.

The need for COVID isolation, however, created a novel situation to which jails and prisons had to quickly respond. To contain the rapid spread of the pandemic among the inmate population, IDOC officials decided to create a COVID isolation unit in which to place incoming COVID-positive inmates instead of placing these inmates in the RDU with hundreds of other inmates. Prison officials designated ISCC, rather than ISCI, as the new intake facility for COVID-positive inmates. Because ISCC did not have a designated RDU, the prison's visitation area was set up to serve as a makeshift RDU for that prison. *Id.*, ¶¶ 3–4.

The day Plaintiff was transferred to IDOC custody from the Ada County Jail—August 27, 2020—was the very first day that incoming inmates were taken to ISCC instead of the RDU at ISCI. *Id*., ¶ 4. That transport order from Ada County provided only the inmates' names and IDOC numbers. *Christensen Decl., Ex. 1*. The August 27

transport order did not include any information about the transferring inmates' custody levels, housing needs, or other concerns. *Id*., ¶ 6.

When the inmates arrived at ISCC, they all wore facemasks, wrist restraints, and leg shackles. *Id.*, ¶ 7. Because they were masked, "the inmates were not recognizable or readily identified by anything other than their inmate number." *Decl. of Leigh Miller* ("Miller Decl."), Dkt. 20-15, ¶ 4. Defendant Sergeant Miller, along with other correctional officers, met the incoming COVID-positive inmates at the transport bus.

Plaintiff informed Miller that it was not safe for him to be "left in a room with general population inmates." *Am. Compl*., Dkt. 9, at 9. Plaintiff claims Sergeant Miller responded, "Okay." *Id.* Miller does not contest this fact.

Miller and others began to uncuff and escort the inmates, in groups, into the visitation center. *Miller Decl*., ¶ 5. The inmates were then lined up against a wall for the intake process.

During this process, Defendant Captain Martinez, who had been in his office when the inmates arrived, briefly entered the visitation center. *Decl. of Dagoberto Martinez* ("Martinez Decl."), Dkt. 20-14, ¶¶ 3–4. Captain Martinez entered only a short distance into the hallway, momentarily assessing the situation before returning to his office. *Id*. at ¶ 4–6.

Plaintiff states he told Sergeant Miller a second time that he was a protective custody inmate and that prison gang members were going to carry out a "hit" on his life. Plaintiff also attempted to inform Captain Martinez of the same. *Am. Compl.* at 3, 9.

Plaintiff claims that Martinez responded, "We will get you taken care of" or "We will take care of the situation. *Id*. at 6–7. Martinez does not contest that he made this statement, but he does state he did not hear Plaintiff say anything about safety concerns and did not realize Plaintiff was speaking. *Martinez Decl.* ¶ 5. Had Martinez heard Plaintiff's statement about being unsafe, he would have had Plaintiff escorted to the segregation unit.

Sergeant Miller acknowledges that, while in the visitation center, Plaintiff told her, "Hey I am going to be jumped." *Miller Decl.*, ¶ 5. She asked by whom, and Plaintiff pointed back towards the room where inmates were being searched. *Id*. Miller said, "Just a minute," and then immediately reported Plaintiff's concerns to Warden Christensen, who was in the visitation center to supervise the intake process and monitor the inmates. *Id.*; *Christensen Decl.*, ¶ 8.

Warden Christensen began to instruct Sergeant Miller on the appropriate steps to take to address Plaintiff's concerns, but while Christensen was speaking, an inmate named Torson attacked Plaintiff. *Christensen Decl.*, ¶ 8. Warden Christensen and other officers took Torson down and stopped the assault within seven seconds. *Id.* and *Ex. 2 through 6*; *Miller Decl.*, ¶ 6. After Plaintiff was assessed for injuries, he was placed into protective custody.

### 2.      Plaintiff's Administrative Grievances and Defendants' Responses

Inmates wishing to file a grievance in prison must follow a three-step process. *Decl. of Krista Dockstader* ("Dockstader Decl."), Dkt. 20-10, ¶ 5.[2] This process is outlined in IDOC Policy 316 and IDOC Division of Prisons Standard Operating Procedure 316.02.01.001 ("SOP 316"). *Id.* at ¶ 4 and *Ex. B*. All inmates are instructed on the grievance process. *Id.* at ¶ 3.

The process requires the following:

1)      An inmate with a complaint must first attempt an informal resolution by completing an inmate concern form. The concern form must be addressed to the staff member most capable of responding to and resolving the concern. If the inmate does not receive a response to the concern form within seven days, the inmate may proceed to the next step.

2)      If the inmate is not satisfied with the response to the concern form, or if there is no timely response, the inmate must then file a grievance form. The inmate must attach a copy of the concern form to the grievance, showing the inmate's previous attempt to resolve the issue informally. The grievance must contain specific information about the nature of the incident and must include dates, places, and names of staff members about whom the inmate complains. In the grievance, the inmate must also propose a solution to the problem.

---

[2] Dockstader is the Grievance Coordinator for ISCC. *Dockstader Decl.*, ¶ 11. Thus, Dockstader has access to all grievances and appeals, as well as a listing showing whether the grievances were timely filed or appealed.

      a.     If the grievance is improperly filled out, it is returned to the inmate with instructions on how to correct the deficiency.

      b.     If the grievance is properly filled out, it is forwarded to the appropriate staff member for an initial response, the "Level 1" response. The grievance and Level 1 response are then forwarded to a "reviewing authority," typically a deputy warden, for the "Level 2" response. The reviewing authority may deny, modify, or grant the inmate's suggested solution. The Level 2 response is then returned to the Grievance Coordinator. The Grievance Coordinator files an electronic copy of the grievance and responses and returns the original forms, along with an electronic copy, to the inmate.

3)     If the inmate is not satisfied with the Level 1 and Level 2 responses to the grievance, the inmate must continue to the final step of the process by filing a grievance appeal. The appeal is forwarded to the "appellate authority," who is usually the head of the facility, the warden. The appellate authority decides the appeal, and the inmate is informed of the decision. Only after this third step, the grievance appeal, is the grievance process considered completed.

*Dockstader Decl.*, ¶¶ 5–10.

     On September 16, 2020, Plaintiff filed a grievance (the "First Grievance"), complaining he was not adequately protected from the attack by Thorson. *Id.*, ¶ 12 and

*Ex. C*. This First Grievance was returned to Plaintiff without action because Plaintiff did not attach a concern form as required by the prison's grievance policy. *Id*.

On September 22, 2020, Plaintiff filed another grievance form (the "Second Grievance"). The Second Grievance was also returned without action for failure to attach the required concern form. *Id*.

The same day, Plaintiff submitted yet another grievance ("the Third Grievance"). This Third Grievance properly attached the concern form but identified only Sergeant Miller as the staff member who allegedly failed to protect Plaintiff. *Id*., ¶ 13 and *Ex. C*. The Third Grievance did *not* name Captain Martinez.

As a suggested solution, Plaintiff requested the following: "[W]hen an inmate says he is PC [protective custody] that it not be taken lightly. When someone says their safety is in jeopardy it's usually for a reason[.] It's in [IDOC's] motto to protect the public AND inmates. In which this is an issue of failure to protect." *Id., Ex. C*.

Captain Martinez acted as the Level 1 responder in the Third Grievance against Miller. Martinez followed up with Miller and gave the following Level 1 response: "In the future anytime an individual request [sic] protective custody and or any housing concerns, the individual will be addressed, moved to a safe environment and the staff will contact the shift commander." *Id.*

Deputy Warden Dietz, as the reviewing authority, considered Martinez's response and then issued the Level 2 response. Dietz apologized for the incident and said he was "grateful that the warden was there to intervene and stop the attack." *Id*. Dietz also noted that Plaintiff's group of inmates "were the first RDU offenders that [ISCC] ha[d]

managed" and stated, "[W]e have improved our processes with the things we have learned." Dietz continued, "We are also working with County Sheriff Departments to receive some housing information about offenders entering RDU because currently they do [not] provide IDOC any."[3] *Id*.

Deputy Warden Dietz classified Plaintiff's grievance as "Modified." *Id*. After Plaintiff received the response to the Third Grievance, he did not file a grievance appeal.

Instead, Plaintiff filed a fourth grievance (the "Fourth Grievance") against Sergeant Miller on October 13, 2020. *Dockstader Decl*., ¶ 14 and *Ex. C*. The Fourth Grievance was returned without action because the issue had already been addressed in the Third Grievance. *Id*.

Plaintiff later filed the instant civil rights action, asserting failure-to-protect claims under the Eighth Amendment and negligence claims under Idaho state law.

## DISCUSSION

1.  **Plaintiff's Claims Against Miller Are Properly Exhausted, But His Claims Against Martinez Are Not**

Defendants argue that Plaintiff's claims must be dismissed because Plaintiff did not exhaust available administrative remedies. Specifically, Defendants argue that Plaintiff did not file a grievance appeal. Defendants also contend that Plaintiff's claims against Martinez are unexhausted because the Third Grievance did not name Captain

---

[3] The response from Deputy Dietz actually states, "currently *they do provide* any [housing information]." *Dockstader Decl*., *Ex. C* (emphasis added). This omission of the word "not" appears to be a mere typographical error. The context of the response suggests sheriff's departments did *not* provide housing information or any other information regarding an inmate's need for protective custody. This interpretation is also consistent with the Transport Order from the Ada County Jail to IDOC—which does not contain any information regarding custody levels or housing concerns.

Martinez. *Defs.' Memo. in Supp.* at 7. For the reasons that follow, the Court agrees with

Defendants only with respect to the claims against Martinez.

### A.      *Standards of Law Governing Exhaustion*

Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), prisoners are

required to exhaust all available administrative remedies within the prison system before

they can include the claims in a civil rights lawsuit challenging the conditions of their

confinement. 42 U.S.C. § 1997e(a). "Proper" exhaustion of administrative remedies is

required, meaning that the prisoner must comply "with [the prison's] deadlines and other

critical procedural rules because no adjudicative system can function effectively without

imposing some orderly structure on the course of its proceedings." *Woodford v. Ngo*, 548

U.S. 81, 90–91 (2006).

"There is no question that exhaustion is mandatory under the PLRA and that

unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211

(2007). Courts are not permitted to "read futility or other exceptions into [the PLRA's]

statutory exhaustion requirements." *Booth v. Churner*, 532 U.S. 731, 741 n.6 (2001). The

exhaustion requirement is based on the important policy concern that prison officials

should have "an opportunity to resolve disputes concerning the exercise of their

responsibilities" before being haled into court." *Jones*, 549 U.S. at 204. "[I]t is the

prison's requirements, and not the PLRA, that define the boundaries of proper

exhaustion." *Id.* at 218.

An inmate is required to exhaust only those remedies that are "available." That is,

an inmate must exhaust "those, but only those, grievance procedures that are 'capable of

use' to obtain 'some relief for the action complained of.'" *Ross v. Blake*, 578 U.S. 632, 642 (2016) (quoting *Booth*, 532 U.S. at 738). The PLRA does not require exhaustion where no pertinent relief is available. *Booth,* 532 U.S. at 739. "A prisoner need not press on to exhaust further levels of review once he has either received all 'available' remedies at an intermediate level of review or been reliably informed by an administrator that no remedies are available." *Brown v. Valoff*, 422 F.3d 926, 935 (9th Cir. 2005).

Lack of exhaustion is an affirmative defense. If the defendant shows that (1) an available administrative remedy existed and (2) the prisoner failed to exhaust that remedy, then the burden of production shifts to the plaintiff to bring forth evidence "showing that there is something in his particular case that made the existing and generally available administrative remedies effectively unavailable to him." *Albino v. Baca*, 747 F.3d 1162, 1172 (9th Cir. 2014) (en banc). However, the ultimate burden of proving failure to exhaust remains with the defendant. *See Brown*, 422 F.3d at 936.

There are three general situations that can render a prison or jail grievance process unavailable to an inmate. First, an administrative procedure is not available, and therefore need not be exhausted, "when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Ross*, 578 U.S. at 643.

Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. In this situation, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* "When rules are so confusing that no

reasonable prisoner can use them, then they're no longer available." *Id.* (internal quotation marks and alteration omitted).

Finally, administrative remedies will be deemed unavailable if prison officials "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation" or if administrators otherwise interfere with an inmate's pursuit of relief. *Id.* at 644. For example, if prison officials prohibited an inmate from accessing "the necessary grievance forms within the prison's time limits for filing the grievance," the plaintiff's failure to exhaust will be excused. *Albino*, 747 F.3d at 1172–73.

In this case, Plaintiff is pursuing similar claims against two defendants—Sergeant Miller and Captain Martinez. Therefore, Plaintiff was required to exhaust administrative remedies as to each defendant, following the IDOC Grievance Procedures in full. Below, the Court analyzes the exhaustion issue with respect to each Defendant separately.

### B.    *Plaintiff's Claims Against Defendant Miller Were Properly Exhausted*

Plaintiff's First and Second Grievances were returned without action because he did not include attached concern forms as required by IDOC's grievance policy. His Fourth Grievance was returned without action because he had already grieved the issue. None of these grievances complied with IDOC's grievance policy. Therefore, they could not serve as a basis to exhaust Plaintiff's administrative remedies.

Plaintiff's Third Grievance against Sergeant Miller, on the other hand, properly attached a concern form. The record establishes that, with the Third Grievance, Plaintiff satisfied steps one and two of the IDOC grievance process. Plaintiff did not proceed to

the third step, the grievance appeal. Defendants argue that Plaintiff's failure to appeal the response to the Third Grievance renders all of his claims unexhausted.

The Court disagrees. "An inmate has no obligation to appeal from a grant of relief, or a partial grant that satisfies him, in order to exhaust his administrative remedies." *Harvey v. Jordan*, 605 F.3d 681, 685 (9th Cir. 2010). As the Ninth Circuit has explained, if a prison official purports "to grant relief with which [an inmate] is satisfied," the inmate's exhaustion obligation is at an end. *Id*. An inmate is simply not "required to appeal [a] favorable decision" by prison officials. *Id*.

Plaintiff's Third Grievance was, at the very least, a partial grant of relief. Both the Level 1 and Level 2 responses acknowledged that the attack occurred and informed Plaintiff that, in the future, the prison would be handling the intake process differently so as to lessen the risk of inmate-on-inmate attacks. Dietz apologized to Plaintiff for the incident and stated that IDOC had since improved the intake process. Likewise, Captain Martinez's response explained these procedural changes: "In the future anytime an individual requests protective custody and or any housing concerns, the individual will be addressed, moved to a safe environment and the staff will contact the shift commander." *Id*. This is essentially what Plaintiff had requested in the Third Grievance: that inmate safety during the intake process at ISCC be considered a top priority and should not be taken lightly. *See Dockstader Decl*., Ex. C.

Although Deputy Warden Dietz's Level 2 response was classified as a "modified" grievance disposition, the *contents* of the response are so similar to what Plaintiff requested as to reasonably lead Plaintiff, and this Court, to believe that Plaintiff's

suggested solution was, in fact, granted. By prefacing the response with, "In the future," Dietz signaled a change from the procedure that was in place at the time of the incident. In addition, the response indicates that future inmates will immediately be moved to a safe environment and the shift commander notified only after the inmate's safety has been secured. This is a change from the previous process as evidenced by Miller's actions in seeking direction from Warden Christensen before moving Plaintiff away from the visitation center.

Consequently, Dietz's modified response was satisfactory to Plaintiff. The Inmate Handout regarding the Grievance Process provides only one condition under which inmates are required to appeal: when they "think the answer on the grievance is wrong." *Dockstader Decl.*, Ex. B. Because Plaintiff did not think the response to the Third Grievance was wrong, there was no reason, nor any requirement, for Plaintiff to appeal that response.

Therefore, Plaintiff exhausted his administrative remedies with respect to his claims against Sergeant Miller, whom Plaintiff clearly identified in the Third Grievance.

### C.    *Plaintiff's Claims Against Captain Martinez Are Unexhausted*

It is undisputed that Plaintiff did not name Captain Martinez in the Third Grievance, which is the only grievance that complied with the IDOC grievance process. Defendants have thus met their initial burden of showing that Plaintiff did not exhaust administrative remedies as to his claim against Martinez. The burden now shifts to Plaintiff to establish a genuine dispute of material fact.

Plaintiff has not done so. He has failed to present any evidence demonstrating that he did, in fact, identify Captain Martinez directly in any properly filed grievance. The grievance policy expressly requires that grievances contain specific names of the staff members about whom the inmates complain. *Dockstader Decl*., Ex. B. Thus, Plaintiff did not exhaust his administrative remedies with respect to Captain Martinez, and Defendant Martinez is entitled to summary judgment on that basis.

**2.      Merits of Plaintiff's Claims**

As explained above, Plaintiff has exhausted his administrative remedies with respect to his claims against Sergeant Miller. The Court now addresses the merits of Plaintiff's claims, both as to Sergeant Miller and as an alternative means of resolving the claims asserted against Captain Martinez.

Plaintiff alleges that Defendants Miller and Martinez acted with deliberate indifference to a substantial risk of serious harm posed by other inmates. He claims both Defendants knew that he was a protective custody inmate but did not segregate Plaintiff from the general population immediately upon arrival at ISCC. *Am. Compl.* at 6–7, 10. Plaintiff asserts that this conduct violated the Eighth Amendment and Idaho state law. *Id*. at 1.

### A.      *Defendants are Entitled to Summary Judgment on Plaintiff's Eighth Amendment Claims*

Plaintiff brings his Eighth Amendment claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by conduct

of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418. 1420 (9th Cir. 1991).

i.    Eighth Amendment Standard of Law

The Eighth Amendment to the Constitution of the United States protects prisoners against cruel and unusual punishment. To state a claim under the Eighth Amendment, a prisoner must show that he is "incarcerated under conditions posing a substantial risk of serious harm," or that he has been deprived of "the minimal civilized measure of life's necessities" as a result of the defendants' action or inaction. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (internal quotation marks omitted). An Eighth Amendment claim requires the plaintiff to satisfy both (1) an objective standard, "that the deprivation was serious enough to constitute cruel and unusual punishment," and (2) a subjective standard, that the defendants acted with "deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9thCir. 2012), *overruled in part on other grounds by Peralta v. Dillard*, 744 F.3d 1076 (9th Cir. 2014) (en banc).

To rise to the level of an Eighth Amendment violation, the deprivation alleged must be objectively sufficiently harmful, *Farmer*, 511 U.S. at 834, or, in other words, sufficiently "grave" or "serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). "The objective component of an Eighth Amendment claim is therefore contextual and responsive to 'contemporary standards of decency.'" *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) (quoting **Estelle v. Gamble,** 429 U.S. 97, 103 (1976)). "[E]xtreme deprivations are required to make a[n] [Eighth Amendment] conditions-of-confinement claim. *Id*. at 9.

With respect to the subjective prong of an Eighth Amendment claim, a defendant acts with deliberate indifference only if the defendant (1) was aware of the risk to the prisoner's health or safety, and (2) deliberately disregarded that risk. *Farmer*, 511 U.S. at 837. That is, a defendant "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson v. Cty. Of Washoe*, 290 F.3d 1175, 1188 (9th Cir. 2002), *overruled on other grounds by Castro v. Cty. Of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016). Moreover, even prison officials who knew of a substantial risk to an inmate's health or safety will not be liable under § 1983 "if they responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844.

Prison officials who act with deliberate indifference "to the threat of serious harm or injury" by one prisoner against another are subject to liability under § 1983. *Berg v. Kinechloe*, 794 F.2d 457, 459 (9th Cir. 1986). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks, citation, and alterations omitted).

Deliberate indifference in the context of a failure-to-protect claim does not require that a prison official knew the plaintiff "was especially likely to be assaulted by the

specific prisoner who eventually committed the assault." *Farmer*, 511 U.S. at 843.

However, the deliberate indifference standard does mean that even an obvious and

substantial risk of assault by one inmate against another does not result in liability so long

as the defendant official was not subjectively aware of that risk. *Id*. at 844.

> ii. Plaintiff has failed to establish that Defendants were deliberately indifferent to a substantial risk of serious harm

Plaintiff claims that Defendants acted with deliberate indifference to the attack on

him by Inmate Torson. The Court disagrees.

Plaintiff alleges that Defendants knew of his protective custody status before he

arrived at ISCC because it was listed on the transport order. *Am. Compl*., Dkt. 9 at 4,

However, Plaintiff has presented no evidence showing that his protective custody status

was in fact on the transport order, nor has Plaintiff refuted Defendants' production of the

transport order. That order did *not*, in fact, contain this information. Instead, the transport

order provided only the inmates' names, offender numbers, and comments noting parole

violations. *Christensen Decl., Ex. 1*. Further, although Plaintiff had been in protective

custody during his previous incarceration, nothing in the record suggests that either

Defendant was aware of that fact at the time of Torson's attack. The undisputed facts thus

demonstrate that Defendants did not know of Plaintiff's protective custody status until

Plaintiff personally told them about it.

With respect to Sergeant Miller, Plaintiff claims that he told Miller of his need for

protective custody twice while she escorted him into the ISCC visitation center.

However, Plaintiff has not demonstrated that Miller heard him and subjectively perceived

the risk to his safety when Plaintiff *first* attempted to talk to her about it. Although Plaintiff claims that Sergeant Miller responded to the first warning with "okay," this response is not sufficiently specific to support a reasonable inference that Sergeant Miller subjectively understood the risk at that time yet deliberately disregarded that risk.

The undisputed facts demonstrate that Sergeant Miller was escorting a total of thirty-nine inmates, all wearing masks (and thus not readily identifiable) and all of whom had tested positive for COVID-19. Miller also was simultaneously attempting to process the inmates and ensure everyone's safety. It is entirely reasonable that Sergeant Miller may not have fully understood Plaintiff's first attempt to warn her of the safety issue, due to the demands of the job placed on her at that time and the specific conditions occurring at the time. Within this context, an officer saying, "okay" is too vague to establish that she both heard the statement and subjectively perceived a substantial risk of harm at that time.

Moreover, Miller's response in continuing to escort inmates and monitoring everyone's safety after she responded to the first warning cannot be deemed unreasonable under the circumstances. Thirty-eight other inmates also required her immediate attention. Disregarding other inmates so Miller could attend to Plaintiff posed its own security threat. Therefore, Sergeant Miller's failure to take immediate action upon the first alleged warning from Plaintiff does not rise to deliberate indifference where Plaintiff has failed to demonstrate that Sergeant Miller subjectively knew of the substantial risk of harm or that she responded unreasonably.

MEMORANDUM DECISION AND ORDER - 23

However, Sergeant Miller clearly heard and understood a risk to Plaintiff's safety when Plaintiff told her a *second* time, during processing, "Hey I'm going to be jumped." *Miller Decl.*, ¶ 5. Miller immediately followed up on this warning by seeking to identify the specific threat and asking Plaintiff, "by who?" *Id.* When Plaintiff responded by pointing back towards the search room, Sergeant Miller did not know to whom he was referring. *Id.* Nonetheless, she took immediate action by informing Warden Christensen, who was in the room at the time, of Plaintiff's safety concerns.

Inmate Torson attacked Plaintiff at the same moment Warden Christensen was instructing Miller on how to address those safety concerns. It is undisputed that Miller and Christensen immediately ran towards the altercation and that the attack was over within seven seconds. From the moment Plaintiff arrived at ISCC and first warned Miller of his safety concerns up to the time of attack, Sergeant Miller was engaged in one continuous course of action—escorting inmates into ISCC and monitoring everyone's safety during processing.

Taking these facts in the light most favorable to Plaintiff, the Court concludes that Miller's actions were reasonable under the circumstances and did not constitute deliberate indifference. When Sergeant Miller became aware of a potential threat to Plaintiff's safety after the second warning, it was unclear to her whether this was a generalized fear of a group of inmates or whether Plaintiff's fear was substantiated based on a real threat to his person. Miller's attempt to seek clarification and instruction from a higher authority was reasonable given the lack of any clear policy involving protective custody for incoming COVID-19-positive inmates and also in light of Sergeant Miller's

duties to maintain safety for everyone while processing all thirty-nine inmates. Likewise, that the warnings and attack occurred within one continuous course of action, combined with the immediate restraining of Torson and the end of the attack after only seven seconds, does not create a genuine dispute as to Miller's timely response to the risk to Plaintiff's safety.

Plaintiff has similarly failed to establish that Martinez acted with deliberate indifference. The undisputed facts show that Captain Martinez had far less contact with inmates than Sergeant Miller, as Martinez was only briefly in the visitation center and did not assist in the removal of any restraints. Furthermore, Captain Martinez states that he did not hear Plaintiff mention any safety concern and was unaware that Plaintiff tried to speak with him. *Martinez Decl.*, ¶ 4–5.

Plaintiff claims that Captain Martinez responded to Plaintiff's safety concern with, "We will get you taken care of," or "We will take care of this situation." *Am. Compl.* at 7. However, similar to Miller's response of "okay," Martinez's statement that "we will get you taken care of" is much too vague to indicate an actual awareness of a substantial threat to Plaintiff's safety. Every inmate will be "taken care of" one way or another during processing, and such a statement could have been directed at all inmates generally. Thus, Martinez's statement is not inconsistent with his assertion that he neither heard Plaintiff's warning nor spoke to him, and Plaintiff has not refuted Martinez's assertion that he had no direct contact with the incoming inmates.

Captain Martinez has met his initial burden in demonstrating a lack of knowledge of a substantial risk of serious harm, and Plaintiff has failed to refute that fact. Nothing in

the record shows a genuine dispute regarding whether either Defendant acted with

deliberate indifference to Plaintiff's safety. Accordingly, Plaintiff's constitutional claims

must be dismissed.

Because Plaintiff, as a matter of law, has failed to establish a constitutional

violation, the Court need not reach the question of whether Defendants are entitled to

qualified immunity.

### B.      *Defendants Are Immune from Plaintiff's Negligence Claims*

In addition to his § 1983 claims, Plaintiffs brings Idaho state law claims of

negligence against Defendants Miller and Martinez. Defendants argue that, as state

employees, they are entitled to immunity from these claims under Idaho Code § 6-904.

*Defs' Memo in Supp*. at 9-10.

Idaho Code § 6-904(A)(2) generally immunizes governmental employees from

claims arising from an assault that occurred during the scope of their employment.

Immunity does not apply, however, if the governmental employee acted with malice or

criminal intent. "Malice" means "the intentional commission of a wrongful or unlawful

act without legal justification or excuse, whether or not injury was intended." *James v.

City of Boise*, 376 P.3d 33, 51 (Idaho 2016) (internal quotation marks omitted). "Criminal

intent" means "the intentional commission of what the person knows to be a crime." *Id*.

It is undisputed that Miller and Martinez were government employees acting

within the scope of their employment at the time Plaintiff was injured. Therefore, the

burden shifts to Plaintiff to demonstrate a genuine dispute as to whether Defendants acted

with malice or criminal intent. *See Bliss v. Minidoka Irrig. Dist.*, 468 P.3d 271, 285 (Idaho 2020).

Plaintiff has failed to meet that burden. Both states of mind, "malice" and "criminal intent," require at least the same level of intentional disregard as the Eighth Amendment standard of deliberate indifference. Because Plaintiff cannot demonstrate Defendants' deliberate indifference with respect to his constitutional claims as explained above, Plaintiff necessarily also cannot demonstrate malice or criminal intent. Thus, as a matter of Idaho state law, Defendants are immune from liability on Plaintiff's negligence claims.

## CONCLUSION

Plaintiff failed to exhaust administrative remedies with respect to his claims against Captain Martinez. Additionally, Plaintiff failed to establish deliberate indifference, malice, or criminal intent for purposes of his Eighth Amendment and negligence claims against either Defendant. Accordingly, Defendants are entitled to summary judgment on all of Plaintiff's claims.

## ORDER

**IT IS ORDERED** that the IDOC's Defendants' Motion for Summary Judgment (Dkt. 20) is GRANTED, and all claims against Defendants are DISMISSED.

DATED: January 5, 2023

Honorable Candy W. Dale
U.S. Magistrate Judge

MEMORANDUM DECISION AND ORDER - 27